### POWER SERVICE CORPORATION v. JOSLIN.

No. 26113.

District Court, N. D. California, S. D.

March 30, 1948.

Lancie L. Watts, of Kansas City, Mo., for plaintiff.

Frank J. Hennessy, U. S. Dist. Atty. for Northern Dist. of California, Rudolph Scholz, Asst. U. S. Dist. Atty. for Northern Dist. of California, and Paul B. Gibson, all of San Francisco, Cal., for defendant.

CLARK, District Judge.

This cause involved a claim for damages in the amount of $34,343.00 for delay in the performance of a construction contract. Plaintiff alleges damages for delay in construction by failure of the defendants to deliver material at the site of the project.

Plaintiff's petition is in three counts.

Count one seeks a declaration of the rights under the contract as written and in the alternative, if the construction of the contract be adverse to plaintiff, count two seeks reformation of the contract to make it express the intention of the parties; and count three seeks recovery.

The particular provisions of the contract to be construed which affect the present controversy are as follows:

### Article I.

"(a) The work shall be commenced within five (5) calendar days after the date of receipt of notice to proceed, and shall be completed in accordance with paragraph 1-05 of the 'General Provisions and Specifications.'

"(b) The subconstructor shall be required to do the following work:

"The work shall include the furnishing of all plant equipment, labor and materials (excepting materials to be furnished and/or work to be performed by the Constructor and/or others as specifically provided for in the General Provisions and Specifications) and perform all work necessary for the complete erection of Boilers in Power House Number 1, at the Sunflower Ordnance Works, Johnson County Kansas, in strict accordance with plans and specifications and as directed in writing by the Constructor for and in consideration of the Lump Sum price of Four Hundred Forty Eight Thousand Dollars and no Cents ($448,000.00) ; in strict accordance with the specifications, schedules and drawings, all of which are made a part hereof and designated as follows: Specifications entitled 'General Provisions And Specifications for Complete Erection of Boilers in Power House No. 1 At Sunflower Ordnance Works, Johnson County, Kansas' * * *."
Materials to be furnished—(specifications)

"5-04 a. Materials furnished by the Constructor. In general, all materials, equipment and machinery which will actually be incorporated into the permanent construction will be furnished by the Constructor and/or others. Materials and supplies incidental to the permanent construction, including but not limited to cutting oil, wire, fuel for construction equipment, welding bars, cement grout and concrete, scaffolding, forming temporary bracing and blocking, pipe dope and compound, all erection facilities and equipment, etc. will be supplied by the Subconstructor without cost to the Constructor over and above the subcontract price. Fuel for use in testing operating equipment and for putting the plant in operation will be supplied by the Constructor. Materials furnished by the Constructor will be delivered to the Subconstructor at points and in the manner specified. Section VII hereof.

"b. Immediately after starting work under the subcontract the subconstructor shall prepare a 'list of materials' including accessories and equipment required, and shall check this list against the materials, accessories and equipment stored in or adjacent to the Power House in order that shortages may be immediately determined. Such shortages will then be reported to the Constructor for use in obtaining the balance of materials required for the completed work. Such an inventory will be kept current by the Subconstructor during the progress of the work and the Subconstructor will be held responsible for advising the Constructor of his requirements sufficient in advance of the time such items will be required to enable procurement without delaying progress.

"c. Nearly all of the materials required for the work has been stored in Power House No. 1 or in warehouses adjacent thereto. Materials, equipment and machinery which have been stored and which have been subjected to conditions necessitating reconditioning, refinishing, refacing, cleaning, painting packing (in valves and pumps), and similar work to properly prepare for installation and operation will be reconditioned, refinished etc., by the Subcontractor as a part of this subcontract, except however, that such reconditioning, refinishing etc., shall apply only to defects which have resulted from storage and does not include inherent defects in manufacture or material. Materials, equipment and machinery which have been broken or otherwise damaged beyond use or repair during storage, or which have inherent defects in manufacture or material caused through no fault or negligence of the subconstructor will be replaced by the Constructor without cost to the Subconstructor."

"Disputes" provisions.

(a) Of the Contract:

### Article VI

"All disputes concerning questions of fact arising under this subcontract shall be de-

cided by the Contracting officer, whose decision shall be in writing, subject to appeal by either party hereto within 30 days from the receipt of the Contracting Officer's decision to the Chief of Engineers whose decision shall be final and conclusive upon the parties hereto. Notwithstanding this provision, the subconstructor shall diligently proceed with the work as directed."

(b) Of the Specifications.

"1-11. Claims, Protests and Appeals. If the Subconstructor considers any work demanded of him to be outside the requirements of the subcontract, or if he considers any action or ruling of the Constructor or of the inspectors to be unfair, the Subconstructor shall without undue delay, upon such demand, action or ruling, submit his protest thereto in writing to the Contracting Officer stating clearly and in detail the basis of his objections. The Contracting Officer shall thereupon promptly investigate the complaint and furnish the Subconstructor his decision thereon in writing. If the Subconstructor is not satisfied with the decision of the Contracting Officer, he may, within thirty (30) days, appeal in writing to the Chief of Engineers, whose decision, or that of his duly authorized representative, shall be final and binding upon the parties to the subcontract. Except for such protests or objections as are made of record in the manner herein specified and within the time limit stated, the records, rulings, instructions or decisions of the Contracting Officer shall be final and conclusive. All appeals from the decisions of the Contracting Officer authorized under the subcontract shall be addressed to the War Department, Chief of Engineers, Washington D. C. The appeal shall contain all the facts or circumstances upon which the Subconstructor bases his claim for relief and should be presented to the Contracting Officer for transmittal within the time provided therefor in the subcontract."

"Provided, however, in case of dispute or disagreement within the meaning of this paragraph, the Subconstructor shall first submit his protest in writing to the Constructor, stating clearly and in detail the basis of his protest. The Constructor will thereupon investigate the complaint and furnish the Subconstructor its written decision thereon. If the Subconstructor is not satisfied with the decision of the Constructor he may then proceed as outlined herein."

"Delay" provisions.

(a) General Provisions of the Contract.

### Article III

"If the subconstructor refuses or fails to prosecute the work * * * the Constructor may * * * terminate its right to proceed with the work. * * * Provided, that the right of the Subconstructor to proceed shall not be terminated under this Article, because of any delays in the completion of the work due to causes beyond the control and without the fault or negligence of the subconstructor including, but not restricted to, acts of the Constructor. * * *"

(b) General Provisions of the Specifications.

"1-05. Commencement, Prosecution and Completion. A. The Subconstructor will be required to commence work under the subcontract within five (5) calendar days after the date of the receipt by him of Notice to Proceed and will be required to prosecute said work faithfully and energetically and to complete the work within one hundred twenty (120) calendar days, the time to be computed from said date of receipt of Notice to Proceed, except as provided hereafter in this paragraph.

"b. In the event the total payments for work actually constructed by the Subconstructor under the subcontract exceed the original amount of the subcontract, the time for completion of the subcontract will be extended in proportion that payments for work in excess of the original amount of the subcontract bear to the total original consideration of the subcontract. In case the total work actually constructed is less than the specified amount, the time for completion of the subcontract will remain the same as specified herein.

"c. When conditions at the site of the proposed work are considered by the Constructor to be unfavorable to its prosecution, the Constructor may order the subconstructor in writing to suspend work under the subcontract until the Constructor considers that the unfavorable conditions

for the prosecution of the work no longer exist. When the work is so suspended, the time allowed for completion will be increased by an amount equal to the time of suspension as determined by the Constructor.

"d. If the Subconstructor fails to perform the work at a rate satisfactory to the Constructor, as specified in subsection *a* above by reason of delays in the delivery of materials or supplies essential to such performance, because of war priorities, or, because of conditions existing through no fault or negligence of the Subconstructor, he may be excused for such failure upon the presentation to and the approval by the Constructor of a written statement setting forth distinctly the causes of such failure.

"e. In case time for completion of the work is increased due to any of the causes specified herein, it is distinctly understood and agreed that the Subconstructor will accept the additional time in which to complete his subcontract in full satisfaction of any delays encountered, and the Constructor will not be liable for any costs or expenses incurred by the Subconstructor as a result of the increased time for completion of the Subcontract.

"f. Inasmuch as the provisions of the subcontract documents relating to the time for and the rate of performance of the work and the time for completion of the same are inserted for the purpose of enabling the United States Government to proceed with the construction of the Sunflower Ordnance Works in accordance with its predetermined program of War Effort, such provisions are of the essence of the subcontract.

"g. No liquidated damages are provided for under the specifications nor will such damages be provided for in the subcontract."

(c) Special provisions of the Contract.

"This contract is signed and executed by the Power Service Corporation without any intent on the part of the corporation to abandon or waive any right which it may have to submit, prove, and collect damages by reason of the late delivery of materials notwithstanding the provisions of Par. 1-05 of the specifications."

Prior to this contract a general contract was entered into on March 25, 1942, and was designated as "Contract No. W461 eng 10274" between the United States of America and Wm. L. Lozier Inc., Broderick and Gordon; it was what is known as a "cost plus a fixed fee" contract. It covered the erection of the Sunflower Ordnance works near Kansas City.

On September 1, 1942 a subcontract, known as " F F Construction Subcontract No. ", was entered into between Architect-Engineer-Manager, hereinafter designated as A E M, and W. E. Joslin an individual of the City of San Francisco, California, doing business as Cory-Joslin and Macnsons, for the installation of plumbing, heating and ventilating facilities at the Sunflower Ordnance Works. This contract was also a "cost plus a fixed fee" contract. Later the subcontract in question here was entered into between the plaintiff and the defendant.

Leading up to this subcontract, invitation to bid was prepared by C. Howard Murphy, Manager of the Subcontract Department of the A E M. It consisted of a letter, with a copy of the specifications attached.

Bids were opened July 8. Plaintiff's bid was prepared and was submitted on July 8. Plaintiff, the low bidder, at $448,000 lump sum bid was awarded the contract on July 13, this bid covered only the cost of erection. All installation materials and equipment of an approximate value of $1,145,-000 were to be furnished by the defendant, or by those with whom he was contracting, directly or indirectly. Notice to proceed was immediately mailed to and received by plaintiff on July 13.

As soon as the award was made to plaintiff the subcontract department of the A E M through G. Howard Murphy, its manager, prepared a formal subcontract and mailed it to plaintiff for its signature on July 14. Plaintiff refused to sign the subcontract as prepared because it provided for completion in 120 days without including any provision to compensate the plaintiff for damages if delay in performance should result from the shortage of materials. Several weeks went by during which the parties were negotiating in person and by letter with respect to an increase in cost if

performance should be delayed, and with respect to a clause in the contract to protect plaintiff against damages in case of delay.

On August 3, plaintiff wrote defendant that a predicted delay of six weeks would require an increase in the contract price to cover the following items:

| | |
|---|---:|
| Increase in actual costs | $34,343.00 |
| S S O A Bldrs Risk Bond | 1,888.00 |
| Margin 15% | 5,151.00 |
| Total price adjustment on account of delay | $41,382.00 |

On August 4, this proposal was given to the A E M. On the same date A E M advised defendant that no recommendation could be made for additional compensation at that time.

On August 8, plaintiff submitted to defendant a letter requesting that there be appended to the signature sheet of the formal contract the following proviso: "Water wall and roof boiler tubes, which were to have been furnished by the Constructor and available to the subconstructor immediately he was directed to proceed were not and are not as of date of contract so available. This contract is above executed by the subconstructor reserving full rights of recourse to claims for extension of time, and for reimbursement of such increased cost as may be occasioned by non-availability of these above mentioned materials, which were represented in bidding information to be at the site as of date of direction to proceed."

On August 17, defendant wrote plaintiff that the paragraph suggested in plaintiff's letter of August 8 was not acceptable.

On August 22, plaintiff requested the defendant to state in a letter to plaintiff whether a claim for reimbursement of its increased costs would be valid or invalid under the terms of the contract submitted to plaintiff for signature if there should be proven to be;

1. An increase in the subcontractor's cost because of delay in delivery of materials, if he prosecutes the work without due regard to economy in order to complete as early as possible; or

2. An increase of the period of construction beyond 120 days, for the reason of delayed delivery of materials.

On August 31, defendant declined to write such a letter, but indicated that a contract might be approved with a proper reservation on the signature page. Thereafter, on September 11, 1944 there was added to the signature page of the formal contract, before the contract was executed, a clause which was initialed by all of the parties to the contract as follows: "This contract is signed and executed by the Power Service Corporation without any intent on the part of the corporation to abandon or waive any right which it may have to submit, prove and collect damages by reason of the late delivery of materials notwithstanding the provisions of paragraph 1-05."

Performance commenced with the preparation of the inventory required under paragraph 5-04(b). This inventory took more than eight weeks to complete.

No verbal representation was made by anyone to plaintiff in respect to the tubes and headers, as to whether they were or were not in storage. The only representation in this respect is contained in paragraph 5-04(c) of the specifications wherein it is provided: "Nearly all of the materials required for the work has been stored in Power House No. 1, or in warehouses adjacent thereto."

By July 26, plaintiff had progressed to the point in the preparation of the field inventory where it appeared certain that there was a major shortage of materials,—tubes and headers,—that would delay the progress of the work beyond the contract schedule of 120 days. Accordingly on that date plaintiff notified the defendant in writing of the shortages. Defendant immediately referred this letter to the A E M which replied in a letter signed by J. S. Hagan, Chief Engineer, on July 29, that the shortage would not delay the work.

On August 17, and again on August 19, plaintiff confirmed shortages of tubes and headers. At the same time these shortages were specifically called to the attention of Elmer Bennett, representative of the Combustion Engineering Company who had been sent to the job by his employer to expedite performance.

On August 19, defendant through its representative Ralph Jung suggested that

plaintiff go on record with a letter stating certain facts encountered in installing water wall tubes. Such a letter was written on August 29. On August 22, plaintiff wrote defendant that certain water wall headers had been improperly manufactured and would be unfit for use under the contract.

Neither plaintiff nor defendant had any control over procuring any of the materials that the defendant was required to furnish. The tubes themselves were furnished by the Combustion Engineering Company, although manufactured by a steel or tube mill such, for example, as the Republic Steel Corporation, or the Globe Tube Company, or any one of a dozen similar mills. However, these tubes had been shipped to the Combustion Engineering factory where they were cut to length, bent to a definite shape and parts were welded on so as to make a complete unit of a tube to fit in a definite location in the boiler unit that was designed especially for the Sunflower Ordnance Project. In fact, the particular water wall tubes which were used at Sunflower were designed, manufactured and furnished by the Combustion Engineering Company under patents which were solely owned by that company. There was no place else in the United States where these tubes could be obtained other than from the Combustion Engineering Company. It was not possible, therefore, for any of the contracting parties, or others, to go on the open market and purchase the tubes needed. They were manufactured for this particular unit or for units like it only by the Combustion Engineering Company.

The next step was to prepare a schedule of progress, or construction schedule, for approval by the contracting officer of the Government. Plaintiff's original schedule was furnished prior to July 24, but criticisms resulted in a revision on August 17, and it was approved on August 22. This schedule was brought up to date each week. From this schedule the contracting parties were able to determine the exact date on which essential materials such as tubes and headers were required for the orderly prosecution of the contract. It was approved as reasonable by all of the parties concerned, including the Government and the defendant.

There were three units, identical in character, upon which identical operations were to be performed. The normal procedure followed by the plaintiff in the erection of such units was to do the work on unit one, then move to number two and repeat and then to unit number three. The construction crew could work more efficiently on the second and third units due to increased familiarity with the exact operations required. The steps in which a contractor must proceed to attain maximum efficiency in the construction of these units are:

Line and place boiler drums in final position.

Install the tubes for the boiler proper and the water tubes.

Install the air heater tubes in a position back of the boiler, in a separate unit, so to speak.

Place a hydrostatic test on the boiler and water tubes.

Install the boiler brick work, insulation and casing.

Erect the pulverized coal burner and duct work.

Install drum internals and boiler appurtenances such as safety valves, steam gauges and water columns; install the instruments and combustion control, the sensitive part of the work, such as small tubes, fittings and miscellaneous apparatus that control the function of the unit; install the recording instruments that record the steam pressure, steam temperature and the flue gas as it leaves the boiler; install the apparatus that controls the supply of coal to the unit, and the supply of air for combustion in proportion to the load or demand on the unit.

The final phase is what plaintiff calls the "drying out" fire. A slow wood fire is put in the boiler and left for a week to dry out the insulation, the mortar that is in the brick work and in the jacket. At that time the oil and grease that has accumulated in the erection of the work is cleaned out so the boiler is entirely clean before it goes into service. This is followed by a period of adjustment, trial, inspection and operation. This was the sequence in operation.

In estimating for the bid on this job, plaintiff contemplated that the various operations would be done in sequence. This

method is recognized by all contractors and by manufacturer's representatives as being normal and orderly. The design of the unit as a whole by the builder is predicated on the assumption that it will be erected in a normal sequence of procedure. Such a method results in labor saving and time saving.

The only materials that it is claimed delayed the construction program were namely: The water wall tubes and water wall headers.

Plaintiff's proposal and construction schedule, to meet the contract conditions required that these items were to be on the job and available for installation when needed. The installation of the water wall tubes should be done early in the erection program and their installation must be completed before the erector can proceed with the hydrostatic tests, the erection of the boiler brickwork and casing, boiler piping, combustion control and boiler trim.

After being awarded the contract, and while taking inventory of the boiler materials, it was discovered that these shortages existed. No one employed by the defendant was aware of this shortage until after the contract had been awarded, although it was definitely known in the Engineering Department of the A E M. In the time allowed for preparation of bid, it would have been impossible for any bidder to have determined by observation prior to the letting, whether or not there was a shortage of this material, because to have done so would have required the moving and handling of several hundred tons of materials and would have required much more time than was available. The only delay was occasioned by shortages of the water wall tubes and headers.

An inspection was made almost daily by representatives of the A E M and the Government. No complaint was made by these inspectors verbally or in writing to any representatve of the plaintiff.

Claim for damages. The contract called for completion on November 10, 1944. It was actually completed on December 19, 1944. On February 21, 1945, plaintiff submitted a claim for damages in the amount of $9,323.02. On June 30, 1945 an amended claim for $10,008.70 was presented. In each instance the claim enumerated only two items of damages, to-wit:

1. The increased cost of renting equipment.

2. The increased cost of supervisory personnel.

In each instance the claims did not include the following additional elements or items of damage.

1. Cost of 90 days extra time by Borst.

2. Home office overhead for 39 days.

3. Increased cost of labor through delay that is now included in the complaint.

On March 3, 1945 the defendant acknowledged receipt of the claim for $10,008.70 and made no denial of plaintiff's right to damages in that amount and requested additional data. On July 11, 1945, the defendant denied the claim, not on the ground that plaintiff was not entitled to damages, but on the ground that he was unable to determine the amount to which plaintiff was entitled. Specifically the defendant's letter reads:

"Please be advised that Cory-Joslin & Macnsons has made a careful study of the facts stated in all of the foregoing letters, as a result of which Cory-Joslin & Macnsons is unable to determine, 1/ the actual number of days of delay, if any, chargeable to the alleged delayed delivery of water-wall tubes and proper water-wall headers, 2/ the true and correct amount of your claim, and 3/ the part of your claim, if any, properly chargeable to the alleged delay of delivery of said materials.

"Accordingly, Cory-Joslin & Macnsons is herewith denying your claims and both of them in their entirety."

Plaintiff held the opinion that under the "disputes" provision of the contract that it would be necessary to submit its claim to and obtain the opinion of the Chief of Engineers at Washington. Accordingly the Government Contracting Officer made a detailed examination of the facts. These findings, with plaintiff's claim dated September 29, 1945 were forwarded to the office of the Chief of Engineers, Washington. On March 12, 1946, the Chief of Engineers ruled that he had no authority to pass upon the plaintiff's claim because it was a claim for unliquidated damages resulting from

an alleged breach of contract which is recoverable in a judicial proceeding and not through administrative procedure. On June 19, 1946 the present action was instituted.

The questions presented to the Court for decision are:

1. Does the contract between plaintiff and defendant as written provide that defendant shall pay damages caused by the late delivery of material by the defendant.

2. If the contract as written does so provide was the contract breached by the defendant.

3. If the answer is yes to No. 1 and No. 2, was plaintiff damaged, and if so, how much.

4. If the Court's construction of the contract as written is against the plaintiff then should the contract be reformed so as to express the intentions of the parties as prayed for in Count II.

5. Was there any consideration for the special damage clause added to the signature page.

It is not necessary for the Court to comment as to the fourth question as it appears to the Court that the contract as written is a plain and understandable contract, there is a conflict in the contract between the provisions of Par. 1-05(e) of the specifications and the clause added to the contract prior to signature by the parties.

Paragraph 1-05(e) of the specifications provides as follows: "e. In case time for completion of the work is increased due to any of the causes specified herein it is distinctly understood and agreed that the subconstructor will accept the additional time in which to complete his subcontract in full satisfaction of any delays encountered, and the Constructor will not be liable for any costs or expenses incurred by the subconstructor as a result of the increased time for completion of the subcontract."

However, none of the parties signed the contract and the plaintiff refused to sign until the following clause was added to it: "This contract is signed and executed by the Power Service Corporation without any intent on the part of the corporation to abandon or waive any right which it may have to submit, prove, and collect damages by reason of the late delivery of materials notwithstanding the provisions of paragraph 1-05 of the specifications."

This clause was added to the contract at the insistance of the plaintiff; it was approved by every one connected with the contract, certainly there could be no binding contract until it was signed and approved. If the bid and acceptance was the complete contract there would have been no necessity for the bond, the written contract and the formalities leading up to its execution. It must be remembered that the bid itself provided that it would not be binding until the contract and bond was executed and approved.

It is not necessary to follow the steps leading up to the signing of the contract as it is plain that the plaintiff insisted from the start that something must be done about the shortage of material, either an increase in the contract price or the clause allowing damage for delay.

 I will further say that the clause added to the contract is controlling, it must be said that the provision contained in this clause is in conflict with par. 1-05(e) of the specifications and although the contract must be construed in its entirety and the clauses construed together, it is plain here that the added clause was intended to supersede the other and should control, for where there is a plain repugnancy between the provisions of a contract as to a provision originally contained in the contract and an added clause, relating to the same provision and inserted in the contract as this clause was, the earlier clause must yield to the latter as far as the conflict exists, particularly is this true when the added clause expresses, as here, the intention of the parties to the contract. It seems to the Court that there is no difficulty here in construing this contract.

 It is well settled that where there are inconsistent provisions in a contract, one provision being written in, the other being part of the printed form, the written provision (certainly in the absence of any proof to the contrary) will be assumed to express the intent of the parties.

Although this clause was not written but typed as an addition to the contract with the background that lead up to its being

typed and added to the contract there is no distinction in the rule as above set forth.

I am of the opinion that this clause added to the contract before execution evidenced the intention of the parties that the plaintiff here was to be paid any damage it might sustain from failure on the part of the defendant to furnish materials.

Count II will not be considered by the Court and all testimony offered as to Count II will not be considered and the objections to its admissibility will be sustained and where motions to strike were made and taken under advisement by the Court, the motions will be granted.

The next question, was there any consideration for the damage clause on the signature page of the contract?

There is no question in the Court's mind that there was sufficient consideration for the added clause. Sec. 1-29 of the specifications upon which the original bid was based specifically provides that there would be no binding contract until it was executed by all the parties and approved by the A E M, and the contracting officers. This clause providing for damages was added before any of the parties signed the contract; it was a part of the contract; there is ample consideration for the damage clause.

The next question is: can damages be recovered in excess of the claim originally filed by the plaintiff? Counsel for plaintiff contends it can, basing a part of his contention on the pleadings in this case. The Court feels that its decision should be based on the facts brought out at the trial and will deal with the facts in passing on this question.

The evidence shows that on July 24, 1945, plaintiff submitted its claim in the amount of $10,008.70.

On March 18, 1946 plaintiff was paid $1,000.00 and receipted in full under its contract. Plaintiff accepted the $1000.00 and receipted in the following language:

"March 18, 1946.
Power Service Corporation
711 Wesley Temple Bldg.,
Minneapolis, Minn.

Final payment on subcontract F. F. No. 5 to Government Contract No. W-461-Eng-10274 $1,000.00.

Payment in full exclusive of outstanding claim of Power Service Corporation which has been submitted to the Chief of Engineers for decision.

Power Service Corporation
P. C. Gaffney, Treasurer (seal) "

It was known to all the parties what that claim was. Plaintiff reserved its right to the claim as submitted and defendant made payment in full, except this claim, to the subcontractor. All parties had knowledge of conditions as they then existed, defendant, it seems, clearly intended to make final payment in full exclusive of the outstanding claim of plaintiff. Plaintiff states that it so received it, there can be no misunderstanding here.

The Court is of the opinion that it was clearly understood that settlement was made in full and there is no basis for any action against defendant for damages except as was included in the claim reserved.

This case has therefore narrowed down to where it is only a question of determining the amount of damage sustained by the plaintiff through failure to furnish material (limited to the water wall tubes and headers) under the original contract as drawn and as prayed for in count I. It is also limited to the claim, exhibit 35 filed by the plaintiff.

This makes it unnecessary for the Court to pass on the objections and motions to strike made as to evidence introduced in support of Count II and the evidence introduced as to damage claimed in excess of the claim as filed. It also makes it unnecessary for the Court to pass on the motion for judgment on the pleadings as the foregoing disposes of the question raised and overrules in part and sustains in part the questions raised by the defendant. There were several other minor rulings of the Court to the effect that matters were taken under advisement. These objections and motions are not urged in the briefs filed by either side and are of so little importance that it is not necessary that the Court consider them at this time. As to the final question which is the amount of damages that should be awarded to the plaintiff. This is a more difficult question to determine.

While W. Lyle Borst testified that if the water wall tubes had been delivered on time the contract could have been completed in 120 days, and that the plaintiff was delayed by the failure to deliver for a period of forty days. As to the claim that the Court is considering here the amount of such loss is listed in exhibit 35 and it is not necessary to list it here. This testimony of Mr. Borst's was based mainly on the production chart exhibit 62 and I think it can be said that in determining the delay this chart is more or less controlling, in fact it must be considered in connection with a great portion of the testimony given in this case.

The failure to deliver the water wall tubes and headers being the only cause of delay for which damages are claimed, it is necessary to determine the extent of the damage occasioned thereby.

First, as to Boiler No. 1. Plaintiff contends that the water wall tubes were required on August 1, 1944 but that they were not received until August 17, 1944, 16 days late, and the evidence supports the fact that the defendant was advised that they would be needed on August 1, however, the evidence disclosed that the first delay (exhibit 17) was August 16, causing a delay of one or two days according to the time of day they were delivered. The production chart shows that this part of the work was 84.5 per cent complete on August 25, and on this percentage it would have taken to August 31 to complete. It was completed on September 8, eight days later than it should have been if the production chart schedule had been maintained. Only two days should be charged to the defendant.

Second, as to Boiler No. 2. Plaintiff contends that the water wall tubes were required August 8, 1944 but that they were not received until September 20, 1944, 43 days late. On what day delivery was actually made is not clear, however, the production chart shows that plaintiff proposed 42 days for completion, from July 20 to September 3, or 2.38 per cent per day. If they had maintained their schedule they would have completed this segment on October 20. It was practically complete on October 27, seven days late.

Third, as to Boiler No. 3. Plaintiff contends:

Water wall tubes required August 15, 1944

Water wall tubes received September 21, 1944

Water wall tubes 36 days late.

Water wall headers required at start of job, August 15, 1944 latest.

Water wall headers received September 26, 1944

Water wall headers 41 days late.

Boiler tubes on Boiler No. 3 were found to be defective and several days delay was experienced awaiting for new replacement tubes.

If the construction schedule had been maintained it would have been completed on October 14. It was completed October 20, six days late.

The production chart in all, for the water wall tubes and headers for the three boilers, shows 21 days delay, and taking the testimony of Mr. Borst for the plaintiff, and Mr. Joslin for the defendant, both very able engineers and well qualified in this line of work, with the reliance each placed on the production chart, it can be said that 21 days delay resulted in the completion of this work. However, the testimony of the plaintiff is that there was no actual delay on Boiler No. 1 until August 15 because of the delayed delivery of water wall tubes and headers, so we cannot consider the chart in fixing the delay on Boiler No. 1. On Boilers No. 2 and No. 3 we take the completion date as shown by the chart in fixing the number of days plaintiff was delayed because of failure o deliver water wall tubes and headers. Instead of 21 days as shown by the construction chart, we have:

2 days on Boiler No. 1 (Testimony of Plaintiff)

7 days on Boiler No. 2

6 days on Boiler No. 3

a total of 15 days delay.

It must also be borne in mind that during the period of time covered by the contract the plaintiff performed three modifications, under their contract, Modification No. 1 for which the plaintiff was paid $8,382.17; Modification No. 2 for which

plaintiff was paid $4,705.98 and Modification No. 3 for which plaintiff was paid the sum of $5,732.92.

Also between the time when the material was actually required and the time it was furnished, other phases of the construction work proceeded, with the same labor that would have been used on the boilers, during the period of delay. For example, take the date of September 23, the segment "Low Pressure exhaust and steam" item was proposed to be 69 per cent complete, and on that date, September 23, was 89 per cent complete. Item No. 4 of the construction schedule, "Treated, softened water, cooling water" was to be 55 per cent complete and that was 63.8 per cent complete. It is not necessary to take up all of these items that were ahead of schedule but it demonstrates that other segments of the work were proceeding ahead of schedule, while this delay existed on the furnishing of water wall tubes and headers.

I have also eliminated the percentage that the plaintiff was behind in the construction prior to the delay in furnishing the water wall tubes and headers, something over 4 per cent.

The claim as presented by the plaintiff, exhibit No. 35, when broken down into the loss per day, applying the full number of 40 days, is arrived at by division, and the daily loss amounts to $250.21. The 15 day delay, at the above rate amounts to $3,753.15. Plaintiff is entitled to judgment for this amount together with costs which will include the cost of the preparation of transcript, as stipulated by counsel at the trial.

The Court is of the opinion that interest should be allowed on the amount of $3,753.15 from March 18, 1946, the date of the final settlement on the contract. However if counsel have something to present on this question of interest, the Court will hear them by letter in that regard and will make final determination at the time of signing findings of fact, conclusions of law and judgment.

Counsel for the plaintiff will prepare findings, conclusions and judgment in accordance with this opinion.